BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
REX D. GARNER, ESQ.
Nevada Bar No. 9401
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
Email: rgarner@foxrothschild.com
*Counsel for Plaintiffs/Debtors*

Electronically Filed July 22, 2021

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>GYPSUM RESOURCES MATERIALS, LLC,<br><br>☐ Affects Gypsum Resources Materials, LLC<br>☐ Affects Gypsum Resources, LLC<br>☒ Affects all Debtors | Case No. BK-S-19-14796-mkn<br><br>Jointly Administered with<br>Case No. BK-S-19-14799-mkn<br><br>Chapter 11<br><br>**Adversary No. 19-01083-mkn**<br><br>**DEBTORS' MOTION FOR SUMMARY JUDGMENT ON THEIR ADVERSARY COMPLAINT AGAINST REP-CLARK, LLC**<br><br>Hearing Date:   September 16, 2021<br>Hearing Time:   9:30 a.m. |

**TO THE HONORABLE MIKE K. NAKAGAWA AND ALL PARTIES IN INTEREST:**

Gypsum Resources Materials, LLC ("GRM") and Gypsum Resources, LLC ("GR", and together with GRM, "Plaintiffs or Debtors"), debtors and debtors in possession in the above-referenced jointly administered chapter 11 cases (the "Chapter 11 Cases"), by and through their undersigned counsel, Fox Rothschild LLP, respectfully submit Debtors' Motion for Summary Judgment on their Adversary Complaint against Rep-Clark, LLC.

122747776.1                                           1

This Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), which is made applicable to the above-captioned adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, (the "Bankruptcy Rules")[1] and the following memorandum of points and authorities, the separate statement of material and undisputed facts, the exhibits attached thereto, the papers and pleadings on file in the Chapter 11 Cases, and any arguments of counsel the Court may entertain at the hearing on this Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

In 2018, the Debtors and Rep-Clark entered into various agreements that comprised one integrated transaction (the "Rep-Clark Transaction"), under which GR transferred mineral rights to Rep-Clark in exchange for approximately $30 million and, as part of the same transaction, Rep-Clark leased the mineral rights to GRM in a Purported Mining Lease under which GRM must make at least minimum annual royalty payments to Rep-Clark, which extends until GRM has mined and sold 20 million tons of gypsum. Over the life of the agreement, such royalty payments would pay Rep-Clark over $70 million.

The Purported Mining Lease is, however, not a true lease, but is actually disguised financing associated with the Rep-Clark Transaction, as evidenced by the factors courts traditionally use to determine if a lease is a true lease—and thus subject to assumption/rejection under 11 U.S.C. § 365(d)(4)—or not, meaning Debtors would not have to assume or reject the lease. Here, the economic substance and reality of the Purported Mining Lease reveals that it is not true lease because the royalty payments were calculated to ensure a return on investment, Rep-Clark purchased the mineral rights for GRM to exploit, the price paid bore no relation to actual value of the minerals, GRM assumed obligations associated with ownership, and the agreement's natural end transfers ownership of the mineral rights back to GR.

---

[1] References herein to the Bankruptcy Code refer to Chapter 11 of Title 11 of the United States Code, as applicable. References herein to the Bankruptcy Rules refer to the Federal Rules of Bankruptcy Procedure, as applicable. References herein to the Federal Rules refer to the Federal Rules of Civil Procedure.

For all these reasons, Debtors request summary judgment that the Purported Mining Lease is not a true lease, but disguised secured financing.

## II.

## LEGAL ARGUMENT

### A. Statement of Undisputed Facts

Pursuant to LR 7056, please see the separately filed Statement of Undisputed Facts in Support of Motion for Summary Judgment, filed contemporaneously herewith. The Statement is supported by the following exhibits attached thereto:

Exhibit 1, Declaration of James M. Rhodes.

Exhibit 2, Deposition of Rep-Clark Rule 30(b)(6) witness.

Exhibit 3, the February 2018 *Gypsum Reserves Agreement and Joint Escrow Instructions*, with its several exhibits, including the Purported Mining Lease as Exhibit H thereto.

Exhibit 4, the August 2018 First Amendment to Reserves Agreement, with its several exhibits.

Exhibit 5, the October 2018 Second Amendment to Reserves Agreement, with its several exhibits.

Exhibit 6, the Rep-Clark default letter dated May 2, 2019.

Exhibit 7, the Rep-Clark default letter dated May 24, 2019.

Exhibit 8, email from Rep-Clark re tax implications.

### B. Legal Standard for Summary Judgment.

Pursuant to Federal Rule of Civil Procedure 56(c), made applicable by Bankruptcy Rule 7056, summary judgment must be entered when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 250, 106 S. Ct. 205, 91 L. Ed. 2d 202 (1986). The United States Supreme Court has established that the "[s]ummary judgment procedure is properly regarded, not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2566 (1986); *see also*, *Avia Group International, Inc. v. L.A. Gear of California*, 853 F.2d 1557, 1560 (Fed. Cir. 1988).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The *Celotex* case, however, makes clear Rule 56 of the Federal Rules of Civil Procedure does not require the moving party to negate all the elements of the non-moving party's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 880, 110 S.Ct. 3177, 3187 (1990). To the contrary, "the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of summary judgment, as set forth in rule 56(c), is satisfied." *Lujan*, 497 U.S. at 880, 110 S.Ct. at 3187, citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2558.

The non-moving party must go beyond its pleadings and by its own affidavits or similar material set forth specific facts demonstrating that there is a genuine issue of material fact. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Although the district court must resolve any factual issues of controversy in favor of the non-moving party, it must do so "only in the sense that, where the facts specifically averred by that [non-moving] party contradict facts specifically averred by the movant...." *Lujan*, 497 U.S. at 880, 110 S.Ct. at 3188. Moreover, the evidence submitted in opposition to a motion for summary judgment must be admissible evidence. FRCP 56(e); *Orr v. Bank of America NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The non-moving party "is not entitled to build a case on gossamer threads of whimsy, speculation and conjecture." *Collins v. Union Fed. Savings & Loan*, 99 Nev. 284, 302, 662 P.2d 610, 621 (1983) (quoting *Hahn v. Sargent*, 523 F.2d 461, 467 (1st Cir. 1975), cert. denied, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)).

The trial court must not "'assume' that general averments embrace the 'specific facts' needed to sustain the complaint" and must not allow the non-movant "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 880, 110 S.Ct. at 3188. Rather, the non-moving party must set forth "significant probative evidence tending to support the complaint." *Lujan*, 497 U.S. at 880, 110 S.Ct. at 3188 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 268, 290, 88 S.Ct. 1575, 1593 (1968)).

**C.    Legal Factors Related to Leases as Disguised Financing.**

Ordinarily a debtor must assume or reject a lease within a limited time upon filing a petition. *See* 11 U.S.C. § 365(d)(4). The Court can, for cause, extend the period during which a debtor in possession must assume or reject leases. One such justification is the determination of whether the lease at issue is a true lease or disguised secured financing. *In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir. 1988) ("In this Circuit we have also declined to require assumption or rejection of a purported lease that is in substance a security agreement, even where the agreement has taken on the surface formalities of a contract or unexpired lease that might otherwise come within the reach of section 365. *In re Pacific Exp., Inc.*, 780 F.2d 1482, 1487 (9th Cir. 1986)").

Labeling an agreement a "lease" does not necessarily make it one. Whether a lease is bona fide or merely a financing agreement depends on the circumstances of each case. Courts look the economic reality underlying a questioned agreement and not to the labels applied by the parties to determine the true nature of a transaction. "In assessing whether a transaction styled as a lease is indeed a true lease, the presumption that an agreement is what it purports to be gives way to an ultimate determination based on "the economic substance of the transaction and not its form." *Liona Corp., N.V. v. PCH Associates (In re PCH Associates)*, 804 F.2d 193, 200 (2d Cir. 1986). In *PCH Associates*, the Second Circuit ruled that the following circumstances indicate that an agreement is not a true lease:

(i)   payments were not calculated to compensate for use but rather to ensure a return on investment;

(ii)  the "purchase price" was calculated as an "amount necessary to finance the transaction";

(iii) the property was "'purchased by the lessor specifically for the lessee's use'";

(iv)  the lessee originally sought a loan but, to secure tax advantages, the transaction was subsequently structured as a lease;

(v)   "the purchase price was not related to the value of the land"; and

(vi)  the "lessee assumed many of the obligations associated with outright ownership of the property", i.e., property taxes and insurance.

*Id*. at 200–01.

An additional threshold issue is how the agreement allocates risk of ownership (if a lease) or credit (if a form of loan). There cannot be a true lease where the "lessor" has no ownership interest at the end of the lease term. And state law does not control the analysis of whether the lease qualifies as such or is disguised financing, as the Ninth Circuit stated:

> We acknowledge that the agreement qualifies as a lease under California **state law**. However, not every interest that might qualify as a lease under state law is subject to the automatic rejection provision of section 365. Our analysis of the Bankruptcy Code and the legislative history and purpose of section 365(d)(4) convinces us that **the appropriate focus is on the federal law** purposes of Section 365(d)(4) **and the economic realities of this particular arrangement**.

*In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir. 1988) (emphases added).

### D.  The Majority of the Factors Weigh in Debtors' Favor.

#### i.  *Royalties represent a return on investment, not actual use of the minerals.*

The Purported Mining Lease calls for either of two payment streams from GRM to Rep-Clark: (a) a Production Royalty calculated from actual sale of gypsum per year or (b) a Minimum Royalty based on a minimum of one million tons every year. Hence, Rep-Clark built in a guaranteed return on its investment *irrespective* of how mining operations went or whether GRM was able to mine and sell any gypsum at all. *See* Statement of Facts ¶ 17(a). Because these payments must occur regardless of whether the minerals are mined or sold, the royalties more closely resemble interest payments rather than lease payments for use of Lessor's property. And even the Purported Lease's terms transfer ownership of the minerals—once mined—to GRM. *See* Statement of Facts ¶ 7(a).

#### ii.  *The purchase price bore no relation to the value of the minerals.*

In exchange for a payment of $30 million to GR, Rep-Clark gained title to mineral rights worth well in excess of $30 million. Even valuing the minerals at just the Minimum Royalty for 20 million tons, Rep-Clark would receive over $70 million over the life of the Purported Mining Lease. *See* Statement of Facts ¶ 17(c). The royalty rates, which began at $2.75 per ton, which aggregate over the life of the Purported Lease to over $70 million, represent only a fraction of the minerals' true value, so the $30 million purchase price bears no relation to the value of the minerals acquired.

### iii. The mineral rights were purchased by Rep-Clark for GRM's use.

The Purported Mining Lease was an exhibit to the main Reserves Agreement. Rep-Clark would not have done any part of the transaction without the other component pieces, including the Purported Mining Lease. As such, the Rep-Clark Transaction involved Rep-Clark's purchase of the mineral rights, which it then immediately leased to GRM. *See* Statement of Facts ¶ 17(d).

### iv. Tax advantages.

As Rep-Clark testified, and as shown in emails during the negotiations, Rep-Clark structured the transaction as a sale and lease to GRM for tax advantages so that Rep-Clark could secure favorable tax treatment under the depletion allowance associated with mining operations. *See* Statement of Facts ¶ 17(e).

### v. GRM has obligations of ownership.

Under the Purported Mining Lease, GRM assumed many of the obligations normally associated with outright ownership of the Mining Claims. For example: (a) section 3.4 required GRM to pay all taxes and assessments assessed and levied upon or against the Mining Claims, the "Reserves" and the "Production Royalty," including property taxes and the Nevada net proceeds of minerals tax; (b) section 3.5 required GRM to carry insurance and to name Defendant as an additional insured; (c) section 3.8 required GRM to keep title to the Reserves free and clear of liens; and (d) section 3.9 required GRM and GR to reclaim the Mining Claims and Reserves disturbed by operations in accordance with local laws, rules, and regulations, and any permits issued thereby, which obligation survived the termination or expiration of the Purported Lease. *See* Statement of Facts ¶ 17(f).

### vi. The mineral ownership returns to GR under all scenarios.

The Purported Lease also permits GRM to obtain a release of any particular Mining Claim by pre-paying the Royalties associated with that Mining Claim, and requires Rep-Clark to quitclaim all the Mining Claims back to GR for no additional consideration upon payment in full of the Royalties. Even upon any default by GRM and even if Rep-Clark retains a different mining operator to exploit the resources up to the 20 million tons it purchased, eventually title to all the mineral rights are to be reconveyed to GR. *See* Statement of Facts ¶ 17(b). This is also unusual of leases, which normally end with title remaining with lessor and possession of the lease premises returning to the lessor.

*vii.    Other factors indicating disguised secured financing.*

The Purported Lease also contains a "hell or high water" clause, requiring payment of the full Compensatory Royalty upon termination, akin to an acceleration clause in a secured loan. Section 2.3 of the Purported Lease provides that upon termination of the Purported Lease at any time, GRM must pay the "Compensatory Royalty" which, in essence, equals the balance of the royalty payments that GRM would have to pay for mining the total 20 million tons called for. In other words, even if the Purported Lease terminated on day one, GRM would owe the entire amount of the Royalty payments due with respect to the unmined Reserves. *See* Statement of Facts ¶ 17(g). This is not usual for true leases, which do not ordinarily contain acceleration clauses for all unpaid rents even if a tenant defaults early into the lease. In fact, the law requires landlords to mitigation damages by making efforts to replace the defaulted tenant. *See, e.g., Conner v. S. Nev. Paving*, 741 P.2d 800, 801 (Nev. 1987) ("a party cannot recover damages for loss that he could have avoided by reasonable efforts").

## III.
## CONCLUSION

For the reasons stated above, Debtors respectfully request that the Court grant summary judgment in favor of Debtors and declare, pursuant to Bankruptcy Code section 105 and 28 U.S.C. §§ 2201 & 2202, that the purported mining lease be recharacterized as secured financing and thus not subject to election under Section 365(d).

Dated this 22nd day of July, 2021.

**FOX ROTHSCHILD LLP**

By  */s/ Rex D. Garner*
    BRETT A. AXELROD, ESQ.
    Nevada Bar No. 5859
    REX D. GARNER, ESQ.
    Nevada Bar No. 9401
    1980 Festival Plaza Drive, Suite 700
    Las Vegas, Nevada 89135
    *Counsel for Plaintiffs/Debtors*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of July 2021, a true and correct copy of the foregoing **DEBTORS' MOTION FOR SUMMARY JUDGMENT ON THEIR ADVERSARY COMPLAINT AGAINST REP-CLARK, LLC** was served:

☒ (VIA ECF System): The foregoing document will be served by the court via notice of electronic filing and hyperlink to the document.

BRETT A. AXELROD on behalf of Plaintiff GYPSUM RESOURCES MATERIALS, LLC baxelrod@foxrothschild.com, pchlum@foxrothschild.com;mwilson@foxrothschild.com

BRETT A. AXELROD on behalf of Plaintiff GYPSUM RESOURCES, LLC baxelrod@foxrothschild.com, pchlum@foxrothschild.com;mwilson@foxrothschild.com

CHARLES E. GIANELLONI on behalf of Defendant REP-CLARK, LLC cgianelloni@swlaw.com, jmath@swlaw.com;mfull@swlaw.com;jstevenson@swlaw.com;docket_las@swlaw.com

ROBERT R. KINAS on behalf of Defendant REP-CLARK, LLC rkinas@swlaw.com, jmath@swlaw.com;mfull@swlaw.com;docket_las@swlaw.com;nkanute@swlaw.com;jstevenson@swlaw.com

KEVIN M. SUTEHALL on behalf of Plaintiff GYPSUM RESOURCES MATERIALS, LLC ksutehall@foxrothschild.com, dloffredo@foxrothschild.com

KEVIN M. SUTEHALL on behalf of Plaintiff GYPSUM RESOURCES, LLC ksutehall@foxrothschild.com, dloffredo@foxrothschild.com

I declare under penalty of perjury that the foregoing is true and correct.

                                                   */s/Patricia Chlum*
                                         An employee of Fox Rothschild, LLP

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)