E-filed:  July 23, 2021

1   Robert R. Kinas (NV Bar No. 6019)
    Patrick G. Byrne (NV Bar No. 7636)
2   Charles E. Gianelloni (NV Bar No. 12747)
    Aleem Dhalla (NV Bar No. 14188)
3   SNELL & WILMER L.L.P.
    3883 Howard Hughes Parkway, Suite 1100
4   Las Vegas, NV 89169
    Telephone: (702) 784-5200
5   Facsimile:  (702) 784-5252
    Email: rkinas@swlaw.com
6          pbyrne@swlaw.com
           cgianelloni@swlaw.com
7          adhalla@swlaw.com
    *Attorneys for Rep-Clark, LLC*

8

9                **UNITED STATES BANKRUPTCY COURT**

10                      **DISTRICT OF NEVADA**

11

12   In re                                    Case No. 19-14796-mkn – LEAD CASE

     GYPSUM RESOURCES MATERIALS, LLC,         Chapter 11
13   fdba High Grade Gypsum, LLC,
                                              Jointly Administered
14   Affects:
     ☒ All Debtors                            **Adversary Proceeding No. 19-01083-mkn**
15   ☐ Gypsum Resources Materials, LLC
        (19-14796-mkn)
16   ☐ Gypsum Resources, LLC                  **MOTION FOR SUMMARY JUDGMENT**
        (19-14799-mkn)
17                              Debtors.
                                              **Hearing Date:  September 16, 2021**
18   GYPSUM RESOURCES, LLC, a Nevada
     limited liability company; and GYPSUM    **Hearing Time:  9:30 a.m.**
19   RESOURCES MATERIALS, LLC, a Nevada
     limited liability company;               **Hearing Location:**
20                                               **United States Bankruptcy Court**
                              Plaintiffs,        **Foley Federal Building, Courtroom No. 2**
21                                               **300 Las Vegas Blvd South, Third Floor**
            v.                                   **Las Vegas, Nevada 89101**
22
     REP-CLARK, LLC, a Colorado limited       **Phone Conference No. (888) 684-8852**
23   liability company;                       **Access Code 9882536#**
                              Defendant.
24
            Rep-Clark, LLC, by and through its undersigned counsel, files its Motion for Summary

25   Judgment ("Motion").  The Motion is made pursuant to Rule 56 of the Federal Rules of Civil

26   Procedure, made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure, and is

27   supported by the Memorandum of Points and Authorities set forth below, the Statement of

28   Undisputed Facts, the Declaration of Byron Levkulich filed concurrently herewith, the pleadings

4821-9835-1089

and papers on file in this action, and such matters and argument as may be presented at or prior to the hearing hereon.

DATED this 23rd day of July 2021.

SNELL & WILMER L.L.P.

/s/ Robert R. Kinas

Robert R. Kinas (NV Bar No. 6019)
Patrick G. Byrne (NV Bar No. 7636)
Charles E. Gianelloni (NV Bar No. 12747)
Aleem Dhalla (NV Bar No. 14188)
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
*Attorneys for Rep-Clark, LLC*

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The Mining Lease Agreement ("Mining Lease") is the lease portion of a sale-leaseback transaction between the Debtors and Rep-Clark.  Engaging in pure revisionism, the Debtors now advance an unintended, unsupported, and self-serving interpretation of the Mining Lease in an attempt to avoid Section 365(c)(2) of the Bankruptcy Code.  The undisputed facts and governing law plainly establish that the parties intended to execute – and did, in fact, execute – a sale of mineral rights with a leaseback.  It was not a disguised financing agreement.

The issue presented turns on the parties' mutual intent and not **one** party's unilateral and unexpressed intent.  The Court determines the parties' mutual intent by assessing (1) circumstances surrounding the drafting and execution of the lease, (2) the terms of the lease and related agreements, and (3) the parties' post-transaction conduct.

All evidence here overwhelmingly points to this transaction being exactly what the parties said it was:  a purchase of Mining Claims from GR and a leaseback to GRM for the exclusive right to extract and sell gypsum in exchange for a Royalty Payment.  The parties negotiated the transaction through email communications – leaving an undisputed electronic trail of their objective manifestations.  From beginning to end, the transaction was a sale-leaseback and not a loan.  As a Rep-Clark representative explained when delivering the initial term sheet:

> The term sheet contemplates *a purchase* of a 50-year life of gypsum reserves and then *leasing the reserves back* to GR. This allows GR to retain total control of the mining operation and to receive full value for the gypsum reserves. It also fits in nicely with one of our existing portfolio companies (Reserve Equity Partners, LLC) *which owns mining reserves* across the country.[1]

Although GR inquired about traditional financing, Rep-Clark unequivocally declined such requests, making clear they were an equity investor and not a lender. GR agreed to and endorsed the structure, as confirmed in the email communications: "On a positive note, I can tell you that Jim [Rhodes] would prefer to move forward on a royalty deal like the one we're discussing *versus a debt deal*."[2] And consistent with those communications, the parties moved forward to negotiate and ultimately execute a sale-leaseback transaction.

The Debtors' theory is stillborn because they consider only one component of their transaction with Rep-Clark – the Mining Lease – and ignore the other agreements the parties simultaneously negotiated and executed such as the Reserves Agreement and the Land Royalty Agreement. But Nevada law requires courts to test a transaction under the totality of the circumstances surrounding the transaction, which includes review and consideration of all of the transaction documents. A review of all of the transaction documents makes testing the transaction a lopsided affair in favor of Rep-Clark.

The Debtors have no evidence to support their theory that the parties intended a disguised financing agreement because there is none. Discovery has closed, the depositions are complete, and the factual investigation is done. The Debtors' corporate designee failed to identify any specific evidence showing the parties' intent to execute a disguised financing agreement.

This case is ripe for summary judgment. There are no material issues of disputed fact, and Rep-Clark is entitled to summary judgment as a matter of law.

## II.    STATEMENT OF UNDISPUTED FACTS

In compliance with Local Rule 7056(a), Rep-Clark filed concurrently herewith a separate Statement of Undisputed Facts ("SOUF"), specifying the material facts relied upon in support of this Motion. Rep-Clark's SOUF is incorporated herein by reference.

---

[1] SOUF at Ex. 7 (emphasis added); ¶ 16.
[2] *Id*. at Ex. 6; ¶ 17.

4821-9835-1089

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

III.    **FACTUAL BACKGROUND**

1.      Rep-Clark and its affiliates are in the business of buying mining claims and leasing those claims to third party mining operators for a royalty sufficient to generate financial returns. Rep-Clark and its affiliates have entered into several such transactions throughout the United States, including the transaction described below.

2.      The Debtors own thousands of acres of land in and around their Blue Diamond Hill property located in Clark County, Nevada ("Property").  Prior to the transaction described below, the Debtors owned both the surface rights and the mining claims related to the Property.  The Debtors also operate a mining business on the Property, where they extract primarily gypsum.

3.      The Debtors, interested in paying off old debts and focusing on developing the surface of the Property into residential housing, sought parties interested in the Property's sub-surface rights.  Rep-Clark, interested in adding revenue streams that fit its equity owned business model, sought parties with sub-surface mineral rights to sell.  Rep-Clark and the Debtors crossed paths in 2016.

A.      **The parties' pre-transaction negotiations**

4.      In September 2016, Rep-Clark formally expressed its interest to the Debtors in their Property's sub-surface mining claims.[3]  The parties negotiated the terms and structure of the transaction throughout 2017, and did so primarily through email communications.[4]

5.      In an email from GR to Rep-Clark discussing the potential sale of mining claims, GR attached a summary of terms, which included a potential $75 million "*purchase*" price.[5]  The parties continued to exchange emails discussing the transaction as a sale with a leaseback.  In another exchange, Rep-Clark explained the contours of the sale:

> The term sheet contemplates *a purchase* of a 50-year life of gypsum reserves and then *leasing* the reserves back to GR.  This allows GR to retain total control of the mining operation and to receive full value for the gypsum reserves.  It also fits in nicely with one of our existing portfolio companies (Reserve Equity Partners, LLC) which *owns* mining reserves across the country.[6]

---

[3] *Id*. at ¶¶ 1-3.
[4] *Id*. at ¶¶ 3-11; *see id*. at Ex. 4, Dep. B. Levkulich at 11:1-2, 17-19.
[5] *Id*. at Ex. 7 (emphasis added).
[6] *Id*. (emphasis added).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4821-9835-1089

6.      Rep-Clark further explained that "[the Debtors] do[ ] not have to offer up any person[al] guarantees **(unlike a bank loan or hard money loan)** and can use the funds to extinguish debt."[7]

7.      Early in the negotiations, the Debtors inquired about a debt deal and requested terms consistent with a loan, such as tax treatment, an option to buy-out the royalty interest, terminology for the royalty, and title to the Mining Claims.[8]

8.      However, Rep-Clark pushed back on such requests, explaining to the Debtors that it could not, in whole or in part, structure the transaction as a loan because it would not satisfy Rep-Clark's goals or allow it to receive funding for the transaction from its own lender.[9]

9.      In an email discussing a revised letter of intent, Rep-Clark told GR that it "cannot offer an option to buy-out the royalty interest because as a corporate policy we do not offer options on our assets."[10]   A month later, Rep-Clark emailed GR again regarding a revised letter of intent. Rep-Clark stated that "the overarching comment from our lenders was that the proposed minimum mining royalty was too low relative to **the purchase price** and that reserve life was too short. . . ."[11] Again, in a later email, Rep-Clark took the opportunity to

> clarify that [Rep-Clark] would need to acquire the minerals **in fee (i.e. [Rep-Clark] cannot acquire them through a lease**.  …[T]his may have been mentioned in our last phone call in regards to tax implications.  I spoke with our lenders and investment commitment [sic] and they will only agree to **a fee** acquisition.[12]

When discussing a subsequent draft of the letter of intent, Rep-Clark reiterated its need for the transaction to include "a royalty which is a real property interest which can be deeded to us and recorded in the real property records."[13]

---

[7] *Id.* (emphasis added).
[8] *See id.* at ¶¶ 16-26.
[9] *See id.*
[10] *Id.* at Ex. 8.
[11] *Id.* at Ex. 9.
[12] *Id.* at Ex. 10 (emphasis added).
[13] *Id.* at Ex. 13.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4821-9835-1089

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1    10.    The Debtors did not object to the proposed structure and even agreed that it made

2  more sense – Debtors "would prefer to move forward on a royalty deal like the one we're discussing

3  **versus a debt deal**."[14]

4    11.    The parties then moved to negotiating the specifics of the transaction, including the

5  $30 million purchase price and the amount of the royalty.[15]  Consistent with the parties' prior

6  negotiations, Rep-Clark confirmed its "interest concerning the purchase and sale of the [mining

7  claims] subject to the terms and conditions contained" in the Letter of Intent executed by the parties

8  on or about June 12, 2017.[16]

9  **B.    The transaction**

10    12.    After executing the Letter of Intent and after the conclusion of the agreed-upon due

11  diligence period, the parties entered into several related Agreements.[17]

12                              *The Reserves Agreement*

13    13.    On February 8, 2018, GR and Rep-Clark executed the Gypsum Reserves Agreement

14  And Joint Escrow Instructions ("Reserves Agreement") wherein GR agreed to sell Rep-Clark

15  various rights and assets in exchange for $30 million, including:[18]

16        a.    Mining Claims.  GR sold Rep-Clark certain sub-surface gypsum reserves

17  ("Mining Claims"), subject to GR's reservation of surface rights.[19]

18        b.    Land Royalty.  GR also sold Rep-Clark a monetary interest in sales from the

19  development of a 522-acre tract of land known as Blue Diamond Hill after the "Development Land"

20  was developed and sold.[20]

21

22

23

24

[14] *Id*. at ⁋ 17 (emphasis added).
25  [15] *Id*.
[16] *Id*. at Ex. 6.
26  [17] *Id*. at ⁋ 27; Exs. 1-2, 15.
[18] *Id*. at Ex. 1.
27  [19] *Id*. at Ex. 1, §§ B-D, 1-2. The Reserves Agreement expressly identifies GR as the owner of "certain Gypsum reserves" and states that Rep-Clark "wishes to acquire the Mining Claims" from GR.  *See id.*
28  [20] *Id*. at Ex. 1, §§ F-G.  The Reserves Agreement also identifies GR as the "owner of a 522-acre tract of land commonly known as Blue Diamond Hill…."  *Id.*

- 6 -

c. _Tonnage Payment_.  Rep-Clark acquired the right to a "Tonnage Payment" if the parties' mining engineering company (Robison) was ultimately unable to determine a minimum of 30,000,000 tons of proven gypsum reserves existed on the land with the Mining Claims.[21]

d. _QE Payment_.  Rep-Clark acquired the right to a "QE Payment" if certain royalty coverage ratios contemplated in the Reserves Agreement were not met.  However, the parties agreed that "the Mining Lease will remain in effect, regardless of whether or not the QE Payment is made."[22]

e. _Environmental Payment_.  Rep-Clark acquired the right to an "Environmental Payment" if certain environmental conditions were not met in a "Phase II Environmental Site Assessment Report," which was to be conducted 90 days after closing.[23]

14.     The Reserves Agreement contains headings such as "PURCHASE AND SALE" and "PURCHASE PRICE" and clearly states that "[t]he purchase price of the Acquired Assets shall equal Thirty Million Dollars ($30,000,000)."[24]

15.     The Reserves Agreement also required GR to execute the Gypsum Reserves Grant Bargain and Sale Deed ("Deed") in order to pass title of the Mining Claims to Rep-Clark, and to pay the transfer taxes associated with the recording of the Deed.[25]

*The Mining Lease Agreement*

16.     On February 12, 2018, and pursuant to the Reserves Agreement, Rep-Clark and GRM executed the Mining Lease Agreement ("Mining Lease").[26]  The Mining Lease identifies GRM as the "Lessee" and Rep-Clark as the "Lessor."[27]

17.     The Mining Lease's "Financial Background" identifies Rep-Clark as the owner of the Mining Claims and that those rights were acquired in fee from GR under the Reserves Agreement.[28]

---

[21] _Id._ at Ex. 1, §§ 6.4, 6.6, 9.4.
[22] _Id._ at Ex. 1, §§ H.2, 6.4.
[23] _Id._ at Ex. 1, §§ H.3, 6.6.
[24] _Id._ at Ex. 1.
[25] _Id._ at Ex. 1, § 6.2.1 ; Ex. 17.
[26] _Id._ at Ex. 2.
[27] _Id._
[28] _See id._

4821-9835-1089

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

18.     The Mining Lease gives GRM the exclusive right to extract and sell gypsum found within the Mining Claims in exchange for, among other things, a royalty ("Reserves Royalty").[29]

19.     The Mining Lease contains detailed information related to the Reserves Royalty calculation, the parties' various obligations, defaults and cure periods, and termination.[30]  These terms reflected the parties' negotiations after due diligence and were unique to the ultimate goals of each party.[31]

20.     The Reserves Royalty has two components, a Production Royalty and a Minimum Royalty, which were constructed to protect Rep-Clark in the event that GRM's annual mining efforts were below projections.[32]

21.     The Reserves Royalty was negotiated by the parties and reflected a calculation consistent with the value and quantity of the Mining Claims.[33]

22.     Further, the Mining Lease provided that GRM would be responsible for Reserves Royalty and property taxes, insurance, maintaining title free and clear, and for any reclamation expenses.[34]

23.     Upon termination of the Mining Lease, GRM agreed to pay a "Compensatory Royalty" based on the remaining Mining Claims.[35]

24.     The parties also included in the Mining Lease the ability for GRM to request that Rep-Clark reconvey the depleted Mining Claims back to GR upon the satisfaction of certain extraction requirements so that there were no title issues associated with a split fee (see below) when GR sought to develop the surface.[36]

---

[29] *Id.* at Ex. 1, §§ 4.1-.4.  The Reserves Royalty adopts the same definition as "Royalty Payment" under the Mining Lease.  Ex. 2 § 4.1-.4.
[30] *See id.* at Ex. 2, §§ 4.1-.4.
[31] *See id.* at ¶ 38.
[32] *Id.* at ¶ 39.  The Minimum Payment also impacted the QE Payment under the Reserves Agreement.  *See id.* at Ex. 2 at § 6.4.
[33] *See id.* at ¶ 37.
[34] *Id.* at ¶ 40.
[35] *Id.* at ¶ 41; Ex. 2 § 2.9.
[36] *Id.* at ¶ 42.

4821-9835-1089

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

*The Land Royalty Agreement*

25.    As part of the consideration for Rep-Clark's $30 million purchase, the parties also simultaneously executed the Land Royalty Agreement ("Land Royalty Agreement"), which entitled Rep-Clark to an interest in GR's future sale of the Development Land ("Land Royalty").[37]

26.    The Land Royalty required GR to pay six percent of gross sale proceeds of all or a portion of the Land (defined in the Land Royalty Agreement) or $30,351.54 per acre of the Land sold.[38]

27.    The parties agreed to secure the Land Royalty obligation with certain land on the Property.[39]  The Land Royalty was intended "to be incremental to the mining, not as an offset."[40]

28.    Moreover, the Land Royalty Agreement included a cross-default provision such that a default on one obligation would trigger a default in others.  This reflects the fact that Rep-Clark's $30 million acquisition acquired multiple rights and assets that were inter-related.  Rep-Clark could accelerate the Land Royalty upon default of the Land Royalty Agreement or the Mining Lease.[41]

**C.    The Debtors default, file for bankruptcy, and seek to recharacterize the lease**

29.    The Debtors made a single quarterly Reserves Payment on March 31, 2018 before defaulting under the Mining Lease.  The Debtors failed to make each subsequent Reserves Payment when due.  The Debtors ultimately made the second through fifth quarterly Reserves Payments after curing their payment defaults within the 10-day cure periods provided for in the Mining Lease.[42]

30.    Rep-Clark agreed to extend the time the Debtors had to make their June 30, 2019 Reserves Payment to July 25, 2019.[43]  However, rather than making the Reserves Payment, the Debtors instead filed their chapter 11 petitions in United States Bankruptcy Court, District of Nevada, Lead Case No. 19-14796-mkn) ("Bankruptcy").[44]

---

[37] *Id*. at Ex. 15.
[38] *Id*. at Ex. 15, §1.1.
[39] *Id*. at Ex. 15; ¶ 45; *see also id.* at Ex. 4, 32:3-4.
[40] *Id*. at Ex. 4 at 31:16-23, 32:3-4.
[41] *Id*. at Ex. 15 §§ 6-7; *see id.* at ¶ 46.
[42] *See* No. 19-14796-mkn, at ECF No. 1360.
[43] *Id.*
[44] *See id.* at ECF 1.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4821-9835-1089

1    31.    On August 9, 2019, the Debtors commenced an adversary proceeding against Rep-

2    Clark, asserting for the first time that the Mining Lease is really a disguised secured financing

3    transaction.[45]

4    **D.    The parties engage mining experts to support their positions**

5    32.    Rep-Clark engaged Tom Erwin, Esq. to opine as to the characteristics of a mining

6    lease and whether the lease here qualified as such.[46]  Erwin is a distinguished Nevada lawyer with

7    decades of experience in Nevada negotiating and drafting mining leases, including mining leases

8    in and around Clark County, Nevada.[47]  As a Nevada-based expert, Erwin was already familiar with

9    the Property when engaged.[48]

10    33.    Conversely, the Debtors engaged John C. Lacy, Esq., an Arizona lawyer with

11    knowledge of mining leases.[49]  Lacy was not familiar with Nevada mining leases, was not familiar

12    with the Property or the surrounding area for residential development, and was not familiar with

13    any of the facts regarding the "nature and extent of the existing operations."[50]

14    34.    Erwin opined that the Mining Lease is consistent with Nevada mining leases and, to

15    the extent it deviates from the norm, such deviations reflected the unique circumstances of the

16    transaction (i.e., a long running history of mining operations, known reserves, and retention of the

17    subsurface rights for eventual residential development).[51]  Erwin substantiated his opinion by

18    analyzing several components of the transaction, each time concluding that the component is

19    common in a Nevada mining lease:

20    a.    <u>The payment structures</u>.  According to Erwin, there is a trend that has

21    developed over the last 10 to 20 years where parties include additional payments to protect their

22    investment in the mining claim.[52]  Minimum royalties were not uncommon in mining leases and

23    compensatory royalties may be included in a Nevada mining lease upon negotiations between the

24
_____
[45] ECF No. 1.
25    [46] SOUF ¶ 53.
[47] *See id.* at Ex. 21.
26    [48] *See id.* at Ex. 23, 1:2-25, 12:1-16 (noting that, decades ago, he had a client who was interested in engaging in a gypsum production and land development transaction at the Property).
27    [49] *See id.* at Ex. 22.
[50] *See id.* at Ex. 24, 14:20-25, 17:1-11.
28    [51] *See generally id.* at Exs. 21, 23.
[52] *See id.* at Ex. 23, 26:9-25, 27:1-25.

4821-9835-1089

- 10 -

parties.[53]  As to the production royalty, Erwin concluded that, "[t]he Mining Lease terms which require the Lessee to pay production royalties and which provide that under certain circumstances ownership of the Mining Claims will be transferred to Grantor do not negate the express terms of the Mining Lease."[54]  Lacy does not disagree with this opinion.[55]

           b.   The parties' obligations.  The shifting of certain obligations from the lessor to the lessee is common in negotiations for mining leases.  Erwin testified that the right of the lessee to cure title, for example, is "common in leases that were drafted by mining lawyers."[56]  Lacy does not disagree with this opinion.[57]

           c.   The conveyance option.  Erwin testified that most mineral claim owners in Nevada have an agreement of some with the owner of the surface rights that depleted mining claims will revert back to the surface rights owner.[58]  Otherwise, a surface rights owner seeking to develop property after extracting the minerals will have a split fee, which is rights but not subsurface rights. A split fee makes it nearly impossible to obtain title insurance.  Lacy does not disagree with this opinion.[59]

           d.   Tax issues.  Erwin's opinion was that "[t]he fact that the Reserves Agreement may have been structured to facilitate favorable federal income tax treatment of the payments from Gypsum to RCL is extrinsic to the express terms of the Mining Lease which are typical of mining leases in Nevada."[60]  Lacy testified that there was nothing particular about the tax considerations in this transaction that leads to a conclusion that the transaction could be characterized as a financing agreement.[61]

    35.    In stark contrast to Erwin, Lacy did not have a definitive opinion on whether the transaction should be considered a financing transaction.  Lacy would only opine that the transaction included a number of provisions that he did not typically see in mining leases that made

---

[53] See id. at Ex. 23, 36-38.
[54] See id. at Ex. 21.
[55] See id. at Ex. 22.
[56] Id. at Ex. 23, 22:22-25, 23:6-16.
[57] See id. at Ex. 22.
[58] See id. at Ex. 23, 14:7-17.
[59] See id. at Ex. 24, 45:8-21.
[60] Id. at Ex. 21.
[61] See id. at Ex. 24, 47-48.

4821-9835-1089

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

him "fe[el] that there was something else involved and that a form of financing was certainly an option" in this transaction.[62]

**E.    The Debtors' have no evidence to support their claim**

36.    The Debtors' corporate designee – James "Jim" Rhodes – failed to provide any credible support for their position.  He lacked even a basic understanding of financial terminology and structures.  Rhodes testified that he was only "somewhat" familiar with the Mining Lease.[63] Additionally, it was not Rhodes, but Lukasiewicz, who led the negotiations and sent the email correspondence for the Debtors.

37.    When asked about the Debtors' intent in executing the transaction, he presented conflicting testimony.  In one instance, Rhodes testified that Rep-Clark was interested in *investing* in the Property: "Q. Did [Levkulich] tell you he wanted to invest in your company? A. Yeah, he was interested in getting together and trying to make a deal."[64]  But, later he testified that the transaction was "[a]bsolutely" a loan agreement.[65]

38.    Rhodes was never able to support the Debtors' allegation that Rep-Clark structured the deal as a loan:

> Q.· ·Do you recall Plaintiffs asking Rep-Clark to structure the deal as a loan?
> A.· ·I believe so.
> Q.· ·What was Rep-Clark's response?
> A.· ·**I don't recall.**[66]

39.    Unable to provide any specific facts to show the transaction was meant to be a loan, Rhodes fell back to conclusory statements:  "I don't know if I can.  It was always the intent.  It was always the structure."[67]

40.    Rhodes also failed to identify any portion of the Reserves Agreement or Royalty Agreement that contained an interest provision:  "Q: Can you point anywhere to me where it has

---

[62] *Id.* at Ex. 24, 29:24-25, 30:1.
[63] *See id.* at Ex. 3, 37:1-14.
[64] *Id.* at Ex. 3,13:15-25.
[65] *Id.* at Ex. 3, 18:14-16.
[66] *Id.* at Ex. 3, 21:16-22:1 (emphasis added).
[67] *Id.* at Ex. 3, 21:3-16.

4821-9835-1089

1    an interest provision in either the Reserves Agreement or the Land Royalty Agreement? A: I doubt

2    it. I don't think so. Maybe, but I doubt it."[68]

3        41.    Rhodes was also unable to identify any terms in the agreements that were intended

4    to be a penalty:

> Q:  I'm asking more specifically what terms in the Land Royalty Agreement do you believe were meant to be a penalty?
> A:  Just the whole term.
> Q:  The entire agreement was meant to be a penalty?
> A:  Yes.
> Q:  Specifically in the agreement, what about the agreement was meant to be a penalty?
> A:  Because it was kind of meant to be a joint venture partnership, that they were to supply equity. And we do this in an equity partnership and then build it up over time and then share the profits.
> Q:  So the Land Royalty Agreement was meant to facilitate Rep-Clark's equity position in the company?
> A:  It's the way I rationalized it in my mind.[69]

## IV.    ARGUMENT[70]

The transaction is not a contract to extend financing to the Debtors and is therefore assumable under Section 365(c)(2).  A trustee may not assume or assign an unexpired lease if "such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor."[71]  To identify the nature of a purported lease for purposes of Section 365, the Court applies state law to determine the parties' intent at the execution of the purported lease.[72]  In Nevada, "whether an instrument is or is not a

---

[68] *Id.* at Ex. 3, 33:22-34:2.

[69] *Id.* at Ex. 3, 31:3-20.

[70] Summary judgment is appropriate only when a moving party demonstrates that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Silva v. Smith's Pac. Shrimp, Inc. (In re Silva)*, 190 B.R. 889, 891 (B.A.P. 9th Cir. 1995).

[71] 11 U.S.C. § 365(c)(2).

[72] *See, e.g., In re Reed*, 940 F.2d 1317, 1332 (9th Cir. 1991) ("State law determines the existence and scope of a debtor's interest in property." (citing *Butner v. United States*, 440 U.S. 48, 54 (1979)); *In re Harris Pine Mills*, 862 F.2d 217 n.5 (9th Cir. 1988) ("[W]hat constitutes a lease or a landlord tenant relationship as a matter of economic substance, depends on state law, not on the Bankruptcy Code, absent statutory authority." (citing *Butner v. United States*, 440 U.S. 48, (1979)); *In re Hunt*, 540 B.R. 438, 441-42 (Bankr. D.Idaho 2015) ("[S]tate law is also determinative as to whether a transaction is a true lease or a disguised security interest." (citation omitted)).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4821-9835-1089

lease depends upon the intent of the parties, and not upon the mere form in which it is prepared."[73] Additionally, when a lease is executed with other agreements in one transaction, "they constitute but one instrument or contract."[74]   The Court assesses "the true intentions and agreement of the parties" to an ambiguous contract by considering "the contract as a whole, including consideration of the contract's subject matter and objective, the circumstances of its drafting and execution, and the parties' subsequent conduct."[75]

Here, the plain and obvious intent of the parties was to execute a sale-leaseback as evidenced by (1) the negotiations and drafting of the Agreements, (2) the terms of the Agreements, and (3) the parties' post-transaction conduct.  Further, the Debtors have no law and no evidence to show a genuine issue of material fact.

**A.    The negotiations and drafting of the Agreements confirm the true intention of the parties to execute a sale and leaseback transaction.**

The parties' negotiations leading up to the execution of the transaction evidence an unambiguous intent to structure the transaction as a sale-leaseback.  In Nevada, the stated intentions of the parties and the written agreement are key components of the analysis.[76]  Here, the parties heavily negotiated the transaction, frequently sending emails back and forth.  They agreed to a general structure and then moved on to the more specific details of the transaction.  The written communication shows the parties intended to negotiate a sale-leaseback and not a loan.

*1.    The parties used terms common to sale transactions*

The parties consistently used the term "purchase" and explicitly distinguished the transaction from a loan.  For example, GR exchanged a summary of terms with Rep-Clark that included an offer for a $75 million "purchase" price.  Rep-Clark exchanged a term sheet that "contemplate[d] a purchase of…gypsum reserves and then leasing the reserves back to GR."  Rep-Clark also explained that a sale and leaseback would benefit the Debtors because they would not

[73] *Paul v. Cragnas*, 59 P. 857, 859 (Nev. 1900) (quoting 2 Lindl. Mines, § 861) (analyzing a purported mining lease to determine whether the parties intended to execute a mining lease or a mining license); *see also In re J.A. Thompson & Son, Inc.*, 665 F.2d 941, 947 (9th Cir.1982).
[74] *Butler v. Lovoll*, 620 P.2d 1251, 1253 (Nev. 1980) (citation omitted).
[75] *Ringle v. Bruton*, 86 P.3d 1032, 1039 (Nev. 2004) (citation omitted).
[76] *Id.*

4821-9835-1089

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

"have to offer up any person[al] guarantees (*unlike a bank loan or hard money loan*) and can use the funds to extinguish debt." The parties never used "loan" or "financing" or "credit" to define the transaction structure; it was always defined as a "purchase" of title in the Mining Claims and a "lease."

      2.    *Rep-Clark held itself out as a **buyer** of mining estates*

Rep-Clark is not a lender but, instead, an equity investor. Consistent with this status, Rep-Clark held itself out to the Debtors as a buyer of mining estates, which is consistent with their nationwide business. Rep-Clark told GR that a purchase and leaseback fit "nicely with one of [its] existing portfolio companies (Reserve Equity Partners, LLC) which *owns* mining reserves across the country." Rep-Clark reiterated its need for the transaction to include "a royalty which is a real property interest which can be deeded to us and recorded in the real property records." And consistent with a fee purchase, Rep-Clark informed Debtors that it was funding the purchase, in part, with a lender. As a result, the transaction needed to be structured as a sale and leaseback because, as Levkulich explained: "I spoke with our lenders and investment [committee] and they will only agree to a fee acquisition."

      3.    *Rep-Clark refused to consider structuring the transaction as a loan*

In the beginning of the negotiations, GR inquired about structuring the transaction as a loan. Rep-Clark refused and consistently explained that it must take its interest in fee. When Debtors inquired whether Rep-Clark would take a lease of the mineral rights (instead of a fee purchase), Rep Clark explained: it "cannot offer an option to buy-out the royalty interest because as a corporate policy we do not offer options on our *assets*." Similarly, when the Debtors asked Rep-Clark to include an option term to repurchase the minerals, Rep-Clark explained that it "cannot offer an option to buy-out the royalty interest because as a corporate policy we do not offer options on our *assets*."

      4.  *The Debtors acknowledged and endorsed the sale-leaseback structure*

There is no dispute that the parties understood they were negotiating a sale-leaseback. The Debtors acknowledged, and even endorsed, that intent. GR, when discussing a revised letter of

4821-9835-1089

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

intent, stated that Debtors "**would prefer to move forward on a royalty deal like the one we're discussing versus a debt deal.**"  GR even proposed to reduce the reserve life and minimum royalty and to reduce the purchase price to $30 million with an increased land sales royalty to help "get RLY to a 15.6% IRR."  Notably, GR used terms like internal rate of return, which is generally used to evaluate an investment yield, not a loan.  GR's own emails and language used throughout the negotiations demonstrate that GR was well-aware that Rep-Clark sought to make an equity investment, not a loan.

**B.**    **The terms of the Agreements show the parties' intent to execute a sale-leaseback.**

The terms of the Reserves Agreement and Mining Agreement are further evidence of the parties' intent to execute a sale-leaseback.  The drafting and execution of the subject agreements are important considerations for Nevada courts when testing a lease transaction.[77]  Here, the plain terms of the Agreements, when read together, show the parties' intent to have GR sell Rep-Clark the Mining Claims, then for Rep-Clark to leaseback the Mining Claims for a specified term, with an obligation for GRM to work the mine during the term in exchange for a defined royalty.

1.    *The Reserves Agreement shows the parties' intent for Rep-Clark to purchase the Mining Claims from GR*

The plain language of the Reserves Agreement shows the parties' intent to execute the sale-leaseback transaction.  First, the Reserves Agreement contemplates the sale of the Mining Claims, as well as various other assets and rights, to Rep-Clark for $30 million.  The Reserves Agreement identifies GR as the owner of "certain Gypsum reserves" and states that Rep-Clark" "wishes to acquire the Mining Claims" from GR.  Additionally, the Reserves Agreement contains headings such as "PURCHASE AND SALE" and "PURCHASE PRICE."  And to avoid any doubt, the Reserves Agreement clearly states that "[t]he purchase price of the Acquired Assets shall equal Thirty Million Dollars ($30,000,000)."  There is no ambiguity or room for interpretation with respect to the terms of the Reserves Agreement.

Second, and consistent with purchase and sale agreements, GR was required to execute and deliver the Deed conveying the Mining Claims to Rep-Clark subject to GR's retention of all surface

---

[77] *Id.*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1   rights.  Title does not pass to a lender but only to a purchaser.  <u>Third</u>, the Reserves Agreement

2   contains language requiring the parties to execute the Mining Lease, which shows the two

3   agreements were meant to be a package deal (along with the Land Royalty Agreement).  The

4   Mining Lease is actually attached as an exhibit to the Reserves Agreement.  Thus, the Mining Lease

5   should be tested in conjunction with the Reserves Agreement.[78]

6           2.      *The Mining Lease shows the parties' intent for GRM to lease the Mining Claims*
7                   *from Rep-Clark*

8           The plain language of the Mining Lease shows the parties' intent to execute the lease portion

9   of the transaction.  As established by the Court in *Paul v. Cragnas*, parties in Nevada intend to

10  execute a mining lease if its contents demonstrate that (1) the lessor devested itself of possession

11  of the premise and conferred it on the lessee (2) for a specified term (3) with an obligation for the

12  lessee to "work said mine in a workmanlike manner during said term and (4) pay a defined royalty.[79]

13          Here, the Mining Lease the easily satisfies each of the *Cagnas* elements.  First, Rep-Clark's

14  indisputably intended to divest itself of possession of the Mining Claims as reflected in the opening

15  recitals:  "Lessee [GRM] wishes to obtain and Lessor [Rep-Clark] is willing to grant to Lessee the

16  exclusive right to explore develop, mine, and market the Gypsum and any and all minerals and

17  mineral substances of every kind and nature, associated with or contained in the Reserves, in

18  accordance with the terms and conditions of this Lease."  As to the second element, the Mining

19  Lease would "remain in effect for a primary term (as it may be extended or terminated as provided

20  below, the "Term") for so long as is required to mine and sell the Reserves, unless sooner terminated

21  as provided in Section 2.3."

22          As to the third element, GRM had the obligation to "carry out such operations on the Mining

23  Claims as it may, in its sole discretion, determinate to be warranted, so long as such operations are

24  conducted in a good and miner-like manner in accordance with the procedures acceptable in the

25  mining industry."  Finally, as to the fourth element, the Mining Lease contemplated a multi-

26  component Reserves Royalty.  The plain language of the Mining Lease is evidence of the parties'

27  intent to execute a mining lease.

---

28  [78] *See Butler v. Lovoll*, 620 P.2d 1251, 1253 (Nev. 1980) (citation omitted).
    [79] *Cragnas*, 59 P. at 859-60.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**C.    The parties' post-transaction conduct further confirms that the parties intended to execute a lease, not a disguised financing agreement.**

The parties' post-transaction conduct is further evidence of the parties' intent to execute a sale-leaseback.  First, Rep-Clark recorded the Deed and Deed of Trust conveying the Mining Claims with the Clark County Recorder.  The Deed conveyed the Mining Claims to Rep-Clark in fee, which comprise the entire fee interests in those parcels, with a reservation of surface and development rights by GR.  Second, the Declaration of Value attached to the Deed further shows that the transaction included a real property sale, not secured financing.  Third, GR paid the transfer tax for the transaction, which is a typical obligation of a seller of real property.[80]  A seller typically does not pay a transfer tax unless title passes to the buyer because there is no tax obligation triggered when money is lent.  The evidence of the parties' conduct after the execution of the Agreements further demonstrates that the parties intended to execute a Mining Lease and not a disguised financing agreement.

**D.    The Debtors' allegations in support of recharacterization fail because they rely on inapplicable law and are out of context.**

The Debtors' declaratory relief claim is contextually flawed because it relies on certain provisions in the Mining Lease that are sometimes found in equipment or residential property loans.  The Debtors argue that the presence of these provisions in the Mining Lease transform it into a loan.  This argument fails to recognize the unique characteristics of a mining lease, as recognized by courts and legal scholars.  A mining lease creates a unique relationship between the lessor and lessee, includes different terms, and is motivated by different goals than most other leases.[81]  Cases and characteristics that might be relevant for analyzing another type of lease, such as an equipment lease or a residential property lease, are not relevant for analyzing a Nevada mining lease.[82]  Thus, the Court's analysis should only consider cases testing mining leases under Nevada law.[83]

---

[80] See NRS  375.020 ("Imposition and rate of tax").
[81] See, e.g., 53A Am. Jur. 2d Mines and Minerals §193 (2013) ("[A] mineral lease does not create the ordinary relation of landlord and tenant; it conveys an interest in real property").
[82] Id. Although the Debtors claim that the Court should analyze the Mining Lease for purposes of Section 365(d)(4), cases that consider this provision do so in the context of nonresidential landlord-tenant relationships.
[83] See Cragnus, P. at 859-60.

4821-9835-1089

- 18 -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1       Additionally, the Court loses important context if it compares the provisions in a mining

2  lease with any other type of lease. The case law is clear that the Mining Lease is not a lease for

3  commercial property, not a lease for residential property, and not a lease for equipment. Instead, it

4  is a lease for sub-surface minerals that are extracted by the lessee with a royalty due to the lessor.

5  Adding further to the context and uniqueness of this specific transaction, GR retained the surface

6  rights for later development under the Reserves Agreement. Though the Debtors highlight these

7  uncommon characteristics of the transaction to show proof of a financing agreement, they are

8  actually a natural fit with a mining lease.

9       For example, in their Adversary Complaint, the Debtors argue that the Mining Lease

10  provision allowing the depleted Mining Claims to revert back to GR without any additional cost

11  transforms the Mining Lease into a Loan. This provision in the context of an equipment lease may

12  be evidence of disguised financing, but it is normal in mining leases where the surface rights owner

13  wishes to develop the property after the minerals have been depleted. Here, if Rep-Clark did not

14  reconvey the depleted Mining Claims back to GR, the resulting split fee would have made it nearly

15  impossible for GR to secure title insurance when it attempted to develop the property. This same

16  provision in an equipment lease may be evidence of a disguised financing, but it has no bearing to

17  a mining lease.

18       The Debtors' decision to focus solely on provisions in the Mining Lease is also flawed in

19  that it views the Mining Lease in a vacuum, ignoring the existence of the Reserves Agreement and

20  the Land Royalty Agreement. The Mining Claims were just one of several assets Rep-Clark

21  acquired in the transaction. Rep-Clark also purchased the right to the Land Royalty, the QE

22  Payment, the Tonnage Payment, and the Environmental Payment. When looking at the transaction

23  as a whole, there is no dispute under Nevada law that the parties intended for GR to sell Rep-Clark

24  several assets for $30 million, and for Rep-Clark to lease its newly acquired Mining Claims to

25  GRM in exchange for a royalty. Pointing to a few provisions in the Mining Lease that may be

26  evidence of disguised financing in other contexts does nothing to bolster Debtors' claim that the

27  Mining Lease is disguised financing.

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

## V. **CONCLUSION**

Based upon the facts and legal argument set forth above, this Court should enter summary judgment in Rep-Clark's favor and against the Debtors.

DATED this 23rd day of July 2021.

SNELL & WILMER L.L.P.

_/s/ Robert R. Kinas_
Robert R. Kinas (NV Bar No. 6019)
Patrick G. Byrne (NV Bar No. 7636)
Charles E. Gianelloni (NV Bar No. 12747)
Aleem Dhalla (NV Bar No. 14188)
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
*Attorneys for Rep-Clark, LLC*

4821-9835-1089